UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KIMBERLY LUNDIN, | |
| Plaintiff, | Case No. _____ |
| v. | |
| CITIZENS BANK, N.A, | JURY TRIAL DEMANDED |
| Defendant. | |

### AMENDED COMPLAINT

NOW COMES Plaintiff, Kimberly Lundin by and through her attorney, Sean L. Ruppert, Esquire of Kraemer, Manes & Associates LLC, and files this Amended Complaint alleging as follows:

### I. Nature of the Action

1.  Plaintiff brings this Complaint to recover damages under Title VII of the Civil Rights Act of 1964, Sexual Discrimination Retaliation. Plaintiff was terminated in retaliation of reporting sexual harassment by her supervisor.

### II. Jurisdiction and Venue

2.  This action arises under the Title VII. This Court has jurisdiction over Plaintiff's discrimination claims pursuant to 28 U.S.C. § 1331.

3.  This Court has supplemental jurisdiction over Plaintiff's discrimination claims pursuant to 28 U.S.C. § 1367(a).

4.  Plaintiff is a resident and citizen of Pennsylvania, a substantial part of the events or omissions giving rise to the claims occurred in Western Pennsylvania, and, therefore, this action

is within the jurisdiction of the United States District Court for the Western District of Pennsylvania and the venue is proper pursuant to 28 U.S.C. § 1391(b).

### III. Parties

5. Plaintiff, Kimberly Lundin ("Plaintiff"), is a female adult individual with a primary residence located at 132 Hereford Dr., Oakdale, PA 15071.

6. Defendant, Citizens Bank, N.A. ("Defendant"), is a business located at 525 William Penn Place, Pittsburgh, PA 15219.

### IV. Facts

7. Plaintiff worked for Defendant since 1997. Defendant's bank had changed ownership several times over the years.

8. In 2005, Plaintiff relocated to Defendant's branch in downtown Pittsburgh, Pennsylvania.

9. In early 2012, Plaintiff had confided to a coworker that she was having marital issues.

10. After disclosing this information to her coworker, Plaintiff had noticed that her direct supervisor, Patrick Lister, had been exceptionally friendly to her. He would find ways to speak with her, often for the purpose of discussing personal matters.

11. Plaintiff also noticed that whenever Mr. Lister would address her, that he would stare at her breasts or her buttocks instead of looking at her face.

12. At one point, Plaintiff was called into Mr. Lister's office for a private meeting. During this meeting, no business was discussed. Instead, Mr. Lister took the opportunity to tell Plaintiff that he would be happy to help Plaintiff with "anything she needed" in her personal life,

including "changing the locks on her doors." He stared at her breasts while making this offer. Plaintiff declined his help.

13. These repeated stares, along with Mr. Lister's overall demeanor, made the Plaintiff extremely uncomfortable.

14. In April of 2012, during the workday, Mr. Lister took the Plaintiff into an office that is fairly isolated from the rest of the staff under the pretext that they were going to have a meeting. Mr. Lister instructed the Plaintiff to enter the room, and then closed the door behind her. Plaintiff asked him if anyone else would be attending the meeting. Mr. Lister stated that it would only be the two of them in the room.

15. Mr. Lister, whose title with the company was Group Leader, instructed Plaintiff, whose title was Team Manager, to sit down at table. Mr. Lister then dialed into a conference call. The conference call was intended for Group Leaders only. Mr. Lister announced his presence on the call, then placed the call on speaker phone and muted his microphone so no one else on the call could hear what he was saying to Plaintiff.

16. He then brought out two glasses and a bottle of Champaign. He said to Plaintiff "Let's toast to Ashley being fired!" Ashley was a low-performing employee that he been terminated earlier that day.

17. Mr. Lister continued to talk over the call, with the microphone muted so no one else could hear him. He discussed personal matters with the Plaintiff, while staring very intently at her. His eyes moved from her face, to her breast, to her legs, and back, several times during this period.

18. Mr. Lister's stares, body language, and the fact that he served her alcohol, caused the Plaintiff to experience extreme anxiety.

19. Hoping to avoid a confrontation, the Plaintiff jumped up from her seat the moment that conference call ended moved towards the door. Understanding that his advances where being rebuffed, Mr. Lister jumped up from his seat and put his hand over her hand as she grabbed the door knob to leave. He positioned his body so that she was not able to open the door, and said to the Plaintiff "if you tell anyone about this, I will deny it."

20. After this incident, Mr. Lister's demeanor toward the Plaintiff changed dramatically. He began singling her out for retaliation because she had rebuffed his sexual advance.

21. Mr. Lister removed most of Plaintiff's responsibilities and would constantly come to her desk and scream at her in front of her co-workers.

22. Mr. Lister would scream at Plaintiff for not being higher in her metric, yet she was the highest manager in her metric.

23. Mr. Lister would not provide employees that the Plaintiff supervised with the same level of support and training as employees outside of her supervision.

24. After several months of constant harassment and retaliation, Plaintiff filed a complaint against Mr. Lister with the human resources department. She included details about the meeting with Mr. Lister where he had served Champagne, as well as the behavior toward her since, in this complaint.

25. The retaliation did not stop and the Plaintiff began having panic attacks at work. One panic attack was so severe that the Plaintiff had a coworker take her to the hospital because she was having trouble breathing.

26. In November of 2012, the Plaintiff went out on short term disability due to the anxiety disorder she had developed from Mr. Lister's behavior.

Case 2:15-cv-01548-RCM   Document 2   Filed 12/14/15   Page 5 of 8

27. Plaintiff returned to work in April 2013. Her medical permission to return was contingent upon her being assigned a new supervisor.

28. Upon her return, Plaintiff was now being supervised by Mary Seiger.

29. Ben Oltman was the supervisor for Mr. Lister and Ms. Seiger. Mr. Oltman created a new team for the Plaintiff to supervise that was filled with employees that historically had consistently failed to meet the company's sales goals.

30. Plaintiff worked individually with every underperforming team member and improved each member's performance.

31. Plaintiff subsequently received an Award of Excellence from Ms. Seiger, citing her stellar performance.

32. In August of 2013, Ms. Lister had contacted human resources and advised them that he had given a verbal warning to the Plaintiff in June of 2012 for failing to wrap up some specific duties at the end of her shift.

33. Plaintiff knew nothing about this warning from 14 months prior. A verbal warning, in regards to Defendant's progressive discipline policy still requires a meeting with the supervisor and a form acknowledging that the employee understands and was coached about the infraction. Plaintiff had never had a meeting or verbal warning.

34. In September of 2013, Plaintiff was placed on a Performance Improvement Plan (PIP) by Ms. Seiger for having "items in her que" at the end of her shift. Every other employee with Plaintiff's title and responsibilities also had items in their ques at the end of their shifts, but no other employee received discipline for this.

5

35. Plaintiff then began to receive numerous instances of written discipline for minor infractions. Other employees engaged in similar behavior and received coaching, not written discipline.

36. Plaintiff received a "final written warning" in December of 2013. The warning cited performance and attendance issues. Ms. Lundin had not taken any time off that was not pre-approved by Ms. Seiger.

37. Prior to receiving the final written warning in December, Plaintiff was told by a subordinate that he had received an unwelcome email from a co-worker. He declined to describe the content of this email or state who had sent it. Plaintiff asked the employee if he would like to take the issue to Human Resources (HR). The employee told Plaintiff that he did not wish to take the issue to HR, that he did not feel threatened, and that he would prefer to keep the matter confidential. Plaintiff advised the employee that if there were any other issues, that she would have to notify HR.

38. In January of 2014, the same subordinate received another unwelcome communication from the same source, this time in the form of a note being left on his desk. Plaintiff reported the issue to HR. Plaintiff was then terminated. Stated reason was that she had not reported issue to HR previously.

## V. Allegations

### Count I
### Retaliation in Violation of Title VII

39. The preceding paragraphs are incorporated herein as if set forth at length

40. Plaintiff rebuffed unwanted sexual advances from her supervisor.

41. Plaintiff reported these advances to the HR department.

6

42. Plaintiff received harassment and uneven discipline reporting the issue to HR.

43. Plaintiff was purposefully given an under-performing team to supervise in retaliation for her complaints.

44. Plaintiff was eventually discharged in retaliation for her complaints.

*(Intentionally Blank)*

**Request for Relief**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against the Defendants for the following:

a. Loss of wages in excess of $30,800;

b. Front pay as deemed appropriate by the court;

c. Compensatory and punitive damages against the Defendant as allowed by law;

d. Plaintiff's legal fees;

e. Pre-judgment and continuing interest;

f. Court costs; and

g. Other such relief as the Court may deem just and proper.

Sean L. Ruppert, Esq.
PA ID: 314380

**KRAEMER, MANES & ASSOCIATES LLC**
US Steel Tower
600 Grant St, Suite 660
Pittsburgh, PA 15219
(412) 626-5550 Direct
(412) 637-0144 Fax
sr@lawkm.com